THE STATE OF OHIO, APPELLEE, *v.* TABASKO, APPELLANT.

[Cite as State v. Tabasko (1970), 22 Ohio St. 2d 36.]

(No. 69-385—Decided April 15, 1970.)

*Mr. Daniel T. Spitler,* prosecuting attorney, for appellee.

*Mr. Gerald A. Messerman,* for appellant.

CORRIGAN, J. The first question to be determined in this appeal is appellant's claim that the trial court erred in admitting in evidence at his trial the items seized during the search of the house. Appellant urges that the seizure was unlawful, because the search warrant was based upon an affidavit which was invalid because it lacked facts establishing probable cause and that the contemporaneous arrest of some of the occupants of the house did not validate the search and seizure.

At the outset, we note that appellant in this case was not charged with possession of narcotics himself but rather with violation of R. C. 3719.101, which provides:

"No person shall knowingly permit the use of any store, shop, warehouse, dwelling house, vehicle, boat, aircraft, or any other place whatever owned or controlled by him for the illegal keeping, dispensing, or administering of narcotic drugs."

Under that statute, as applicable to this case, it was necessary for the state to establish that appellant knowingly permitted the use of the dwelling house for the illegal keeping or administering of narcotics and that the dwelling house was controlled by him.

In seeking to establish those elements, the state presented three witnesses who were occupants of the house and each of whom had previously entered pleas of guilty to charges of unlawful possession of narcotic drugs.

Following are excerpts from the testimony of those witnesses.

James R. Meyers, who moved into the home on June 1, 1967, testified:

"Q. Is this your pipe?

"A. Yes.

"Q. And did you smoke marijuana in it?

"A. I believe I did.

"Q. Did other persons use that pipe to smoke mari-

juana during the time you lived at 244 North Enterprise?

"A. Yes.

"Q. Who?

"A. Everybody living in the house except Carl Holloway.

"Q. Does that include Charles A. Tobasko [sic]?

"A. Yes, it does.

"Q. When did Charles A. Tobasko [sic] use it in your presence?

"A. As for a certain date, I couldn't tell you. I know he has smoked in my presence.

"Q. How many occasions if you have an estimate?

"A. Two that I can remember. That's all.

"Q. Were these prior to the raid, but after June one?

"A. Yes, that's right.

"Q. Were they at 244 North Enterprise?

"A. Yes.

"Q. Did you ever have occasion to smoke in different rooms of the house other than your own?

"A. Yes.

"Q. What rooms of the house did you smoke in?

"A. We used to sit in the upstairs kitchen sometimes. Once I remember smoking in Charlie's room [the appellant's], once in Susan Hird's room. * * *"

The testimony of John Betchik, one of the occupants of the home from the first week in June 1967, is as follows:

"Q. Did you smoke marijuana at 244 North Enterprise, Bowling Green, from the time you moved in until the bust on the twenty-eighth of June?

"* * *

"A. Yes.

"* * *

"Q. Did you ever smoke with Charles A. Tobasko [sic]?

"A. Yes, I have.

"* * *

"Q. You did smoke with Mr. Tobasko [sic] when you got there?

"A. Yes.

"Q. Did you smoke after that date with Mr. Tobasko [sic]?

"A. I don't believe so.

"Q. Where did you smoke with Mr. Tobasko [sic]?

"A. Upstairs in the kitchen.

"* * *

"Q. Did Mr. Tobasko [sic] know that there was marijuana in this house and that it was being smoked?

"* * *

"A. I would assume Charlie was as aware of it as anyone else living in the house."

Susan Hird testified, in part:

"Q. Have you ever been in the presence of the defendant in this case, Charles Tobasko [sic], when you were smoking marijuana?

"A. Yes, sir.

"* * *

"Q. When?

"A. I can't give you a specific date.

"Q. Can you give me a period of time?

"A. Sometime during the time you mentioned before.

"Q. How frequently would you smoke?

"A. In Charlie's presence?

"* * *

"Q. Yes.

"A. I don't know. Charlie wasn't around. Charlie would come in and go out. You never knew when he was there and when he wasn't.

"Q. Can you give us your best estimations of the time that he would be in when you were smoking?

"* * *

"A. You want me to give you a number of times?

"Q. Yes, to your best estimation.

"A. I'm sorry. I can't give you a number of times. We smoked continually.

"The Court: Miss Hird, he asked you how many times. Was it ten or one or fifty or none?

"The Witness: Ten, maybe—I don't know. During

a period of two weeks, whenever Charlie walked into a room and we were sitting there.

"Q. How often did you smoke in the house when you lived there?

"* * *

"A. Well, we usually smoked in the evenings, especially in my case since I was going to school and I had to function at school, so we smoked in the evenings.

"Q. Who was there when you smoked in the evenings?

"A. Joh [sic], Jimmy, sometimes Charlie [appellant], sometimes Al. It just depended on whoever was around. Most of the people in the house generally.

"Q. Was there always marijuana in the house?

"A. Most of the time, yes. As far as I can remember, there was always some."

The record shows that Susan Hird moved into the home on June 10th, 11th or 12th, 1967, and the search of the home took place on June 28, 1967.

Of itself, the foregoing testimony overwhelmingly established beyond a reasonable doubt the fact that appellant knowingly permitted the use of the dwelling for the keeping and administering of narcotics. In fact, it reveals that he also participated in using the house for such purposes.

Such testimony, alone, was overwhelmingly sufficient to prove the elements of knowingly permitting the dwelling to be used for the keeping and administering of narcotics without the necessity of referring to the items seized at the house. We are, therefore, of the opinion that even if those items were improperly admitted in evidence at the trial such admission did not operate to appellant's prejudice. The state's case was made without reference to the items seized during the search, and, therefore, we are able to conclude that even if there were error "it was harmless beyond a reasonable doubt." *Chapman* v. *California,* 386 U. S. 18, 24; *Harrington* v. *California,* 23 L. Ed. 2d 284.

The remaining essential element of R. C. 3719.101

necessary for the state to prove in order to convict appellant, was that appellant controlled the dwelling.

In seeking to prove that element of the offense, the state called the owner of the house, Mr. Johnson, as a witness. His testimony established that appellant personally rented the house, that appellant signed the lease, that appellant was the person responsible for sending the monthly rent and that he (Mr. Johnson) held appellant responsible for the care of the premises.

Testimony of the occupants of the house reveals that appellant solicited Meyers and Hird to reside in the house. Betchik testified that the rental share of each occupant was $42 per month, plus $2 per week for food, and that the house was operated on the order of a commune.

Meyers and Hird testified that the household duties were shared, and that the cooking, cleaning and grocery shopping were performed by different persons at different times. They testified also that it was appellant who handled the bookkeeping and kept the accounts.

Meyers, Hird and Betchik all testified to the effect that the house functioned somewhat as a communal venture and that no person was in actual control of it. Notwithstanding those opinions, however, the evidence is abundantly clear that appellant possessed control over the house.

The record shows that the idea of communal living was not conceived by the residents as a group prior to the renting of the house. In fact, appellant personally rented the house and signed the lease. He solicited others to reside there and kept the accounts necessary to show who paid and who had not. It was appellant who was looked upon as being responsible for the house, who left orders concerning things to be done and who made room assignments in the house.

In *Vanderhorst* v. *State*, 151 Fla. 620, 10 So. 2d 138, which involved a prosecution for permitting gambling in a place of which the accused had charge, control or management, the court said, at page 623: "The state is not required to prove the personal presence of the accused in the

room in order to prove control of the room, or that the accused had the exclusive control of same." See, also, *Perry v. State,* 160 Tex. Crim. 8, 266 S. W. 2d 171.

We conclude that the evidence presented, independent of the items seized during the search, was overwhelmingly sufficient to establish the violation of R. C. 3719.101 and to support the jury's finding of appellant's guilt thereunder.

The second question raised by appellant is that the trial court erred in giving the following instruction to the jury:

"Persons who plead [sic] guilty to unlawful possession of a narcotic drug testified as witnesses herein.

"The testimony of said witnesses should be carefully examined and considered with caution. * * *"

Appellant contends that the instruction was erroneous because it singled out that testimony and intimated to the jury the trial court's opinion as to its value and invaded the province of the jury whose function it is to determine the credibility of witnesses. Appellant cites R. C. 2945.42, which reads, in part:

"No person is disqualified as a witness in a criminal prosecution * * * by reason of their conviction of crime."

Under our holding in *State* v. *Murdock,* 172 Ohio St. 221, prior convictions of a witness may be shown for the purpose of affecting his credibility. Here, the state called these witnesses, and it was brought out that each had pleaded guilty to charges of unlawful possession of narcotics. The instruction given to consider with caution the testimony of those witnesses was, on the facts of this case, doubly significant. It could serve to damage the state's case as well as adversely affect any testimony favorable to appellant.

In addition to the instruction complained of, the trial court instructed the jury that it could believe or disbelieve all or any of the testimony of any witness and that it was within its province to determine what testimony was or was not worthy of belief.

Considering those instructions together, we do not

believe that appellant was prejudiced or that the province of the jury was invaded.

The third and final issue raised by appellant is that the trial court erred in instructing the jury on the issue of control of the premises.

The instruction given reads:

"* * * It is not necessary that the defendant own the dwelling, but it is necessary that the state establish beyond a reasonable doubt that the defendant had some degree of control over the premises."

On this issue, the trial court then further instructed the jury:

"The phrase 'controlled by him' means to have the apartment or dwelling under his dominion, management, subjection, regulation or direction."

Appellant urges that "some degree of control" falls short of the requirements of R. C. 3719.101. While we agree with appellant that the statute requires proof that the premises be "controlled by" the accused, we are of the opinion that the trial court's explanation of the phrase "controlled by him" correctly outlined to the jury the degree of proof required for conviction. Taken as a whole, then, the instructions on control of the premises were adequate to inform the jury of its duties in respect to that issue.

Finding the questions raised by appellant to be without merit, we affirm the judgment of the Court of Appeals.

*Judgment affirmed.*

O'NEILL, C. J., LEACH, SCHNEIDER and HERBERT, JJ., concur.*

DUNCAN, J., concurs in the judgment.

LEACH, J., of the Tenth Appellate District, sitting for MATTHIAS, J.

---

*CHIEF JUSTICE TAFT participated in this case which was, however, decided after his death.

LEACH, J., concurring. I concur in the syllabus, the judgment, and am in basic agreement with the opinion. However, I believe that the judgment of affirmance should be based also on an additional reason.

Here, so far as is shown by the record, the first specific claim as to invalidity of the search warrant on the basis of an inadequate affidavit was made in the Court of Appeals.

While a motion to suppress "any evidence seized" was filed by defense counsel on September 21, 1967, in advance of trial, the motion made no reference to or claim of invalidity of a search warrant. An examination of the record of the hearing of October 11, 1967, at which time the motion to suppress was overruled, indicates that the hearing was concerned primarily with the ruling of the court on a motion for a second amended bill of particulars. The only reference to the motion to suppress comprises less than a full page in the supplemental bill of exceptions. No reference is made therein to the warrant or to the affidavit. Having made its rulings as to the bill of particulars, the court inquired of counsel for defendant as to whether "you wish to submit your brief on the question of suppression of evidence?" Counsel responded, "I believe, your Honor, that if the court is in a position to rule right now, I will go along with that." Thereupon, the court announced its order overruling the motion.

There is nothing in the record to show that at or prior to the order of the court of October 11, 1967, overruling the motion to suppress, the search warrant or the affidavit was ever presented to the court. The search warrant appears in the record at only one place; when during trial it was employed by defense counsel in his cross-examination of a police officer; not as a basis for the exclusion of evidence, but as a vehicle for testing or attacking the credibility of the particular witness.

The physical evidence, the admissibility of which is now complained of, actually was admitted in evidence "by consent of counsel."

Even the motion for new trial made no complaint relative to the admissibility of such evidence. The only complaints made therein were as to the claims that "the prosecuting attorney continuously made improper and derogatory references to the appearance of the defendant; to the appearance of defendant's friends; to their manners and morals; for the sole purpose of inflaming the jury against the defendant," and as to "errors at law occurring at the trial, in this, to wit: (a) The verdict was contrary to law, (b) the verdict was contrary to the manifest weight of the evidence."

Under this state of the record, there is no showing that the trial court was even requested to pass on the specific claim of invalidity of the search warrant as a basis for the exclusion of evidence. To the contrary, during trial such evidence was admitted by agreement. In my opinion, a change of defense counsel after trial and during appeal cannot have the effect of erasing the agreement or of permitting such a claim to be raised for the first time in an appellate court. In this connection no claim is advanced herein that prior counsel was other than highly competent and experienced.

O'NEILL, C. J., and HERBERT, J., concur, also, in the foregoing concurring opinion.