OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Yitzchak E. Gold, Assistant Court
Reporter.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.  Your
comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


     The State of Ohio, Appellant, v. Brown, Appellee.
     [Cite as State v. Brown (1992),    Ohio St.3d    .]
Criminal law -- Search and seizure -- Application of harmless
     error doctrine -- In making a Crim.R. 52(A) harmless error
     analysis, any error will be deemed harmless if it did not
     affect the accused's "substantial rights."
     (No. 91-1748 -- Submitted October 20, 1992 -- Decided
December 15, 1992.)
     Appeal from the Court of Appeals for Stark County, No.
CA-8392.
     At approximately 1:00 a.m. on August 1, 1990, Canton
Police Officers Charles Saler and Kevin Clary were patrolling a
high-crime area known for drug activity when they observed
Bergen Allen Brown, appellee, exiting a van in a dimly lit
corner of a bar's parking lot.  Appellee was accompanied by two
other men.  After passing the individuals, the officers made a
U-turn and reapproached them with the cruiser's lights
extinguished.  Upon activating the cruiser's high beams, they
discovered only appellee, who was facing the corner of a
building.  Officer Clary testified that moments before the
cruiser was stopped approximately ten feet from appellee,
appellee looked over his shoulder and then tossed something
from his right hand to the ground.  Officer Saler further
testified that what appellee tossed appeared to be a "clear
baggie or plastic bag."  While Officer Saler restrained
appellee, his partner began looking for the item that had been
thrown.  Moments later, he discovered a plastic bag about two
feet from the spot where appellee had been standing.  Officer
Clary inspected the plastic bag and recognized its contents as
crack cocaine.  No drugs were found on appellee.  Appellee was
placed under arrest.
     After conducting a pat-down search of appellee, Officer
Clary seized the keys to the van.  The officers determined that
appellee was not the registered owner of the vehicle, that the
owner was not available, and that no one was present who could
take custody of the vehicle.  Due to these circumstances, the
officers requested an impoundment of the van.  While waiting
for the impound unit and tow truck to arrive, the officers

conducted an inventory search of the van's interior. Officer Saler found a black belt-like pouch in plain view by the front passenger seat. He then opened it and found a thirty-five millimeter film canister and several empty bags similar to the bag that held the crack cocaine. Although the bags were empty, traces of cocaine were later discovered inside the black pouch. These items were seized and recorded on an inventory sheet.

Appellee was subsequently indicted under R.C. 2925.11(C)(1) on one count of drug abuse. Appellee moved to suppress all evidence seized from the vehicle, specifically the contents of the black pouch. After a hearing, the trial court denied the motion.

On October 23, 1990, appellee was found guilty. He appealed to the Fifth District Court of Appeals, which reversed and remanded, holding that the contents of the black pouch should have been suppressed as the product of an illegal search of a closed container.

The cause is before this court pursuant to the allowance of a motion to certify the record.

Robert D. Horowitz, Prosecuting Attorney, Ronald Mark Caldwell and Kristine Wilson Rohrer, Assistant Prosecuting Attorneys, for appellant.

Steven A. Struhar, for appellee.

Per Curiam. Resolution of the instant appeal centers exclusively on the proper application of the harmless error doctrine. As stated by the United States Supreme Court in Chapman v. California (1967), 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709: "[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."

The court of appeals, in reversing appellee's conviction, focused on the search of appellee's van. Relying on the most recent pronouncement by the United States Supreme Court on inventory searches, Florida v. Wells (1990), 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1, the court of appeals held that the police violated appellee's Fourth Amendment rights by opening the black pouch during the course of the inventory of the van, because there was "no evidence of a specific Canton Police Department policy with respect to the opening of closed containers encountered during inventory searches." Without clearly stating its reasons, the court of appeals concluded that the contents of the black pouch were so prejudicial that their introduction into evidence denied appellee a fair trial.

We cannot agree with the court of appeals. In making a Crim. R. 52(A) harmless error analysis, any error will be deemed harmless if it did not affect the accused's "substantial rights." Otherwise stated, the accused has a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error. Before constitutional error can be considered harmless, we must be able to "declare a belief that it was harmless beyond a reasonable doubt." Chapman, supra, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at

711. Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal. State v. Lytle (1976), 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623, paragraph three of the syllabus, vacated on other grounds in (1978),438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.

In State v. Tabasko (1970), 22 Ohio St.2d 36, 257 N.E.2d 744, the Chapman rule was applied to affirm a conviction for knowingly permitting the use of a dwelling for the keeping, dispensing or administering of narcotics, a violation of former R.C. 3719.101. Appellant sought to overturn his conviction on the grounds that the police unlawfully seized drugs from his house. He maintained that the search warrant was invalid because it was based on an affidavit lacking facts which could establish probable cause. In considering the appeal, this court felt it unnecessary to independently review the affidavit to determine whether the resulting warrant was based upon probable cause. Instead, the court directed its attention to whether the admission into evidence of the items seized during the search operated to the defendant's prejudice. Citing Chapman and Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, the court held:

"In a criminal prosecution, the allegedly erroneous admission in evidence of items unlawfully seized is harmless beyond a reasonable doubt and does not provide grounds for reversal of the conviction where the pertinent testimony of witnesses at the trial is not the product of such seizure and is overwhelmingly sufficient to independently establish the elements of the offense beyond a reasonable doubt." Tabasko, supra, at syllabus.

Since the state's case consisted of testimony which alone overwhelmingly established beyond a reasonable doubt that Tabasko had committed the crime as charged, the court concluded that any alleged constitutional violation was harmless beyond a reasonable doubt and upheld the conviction.

Likewise, in the case sub judice, we hold that any alleged error by the trial court in failing to suppress the contents of the black pouch was harmless beyond a reasonable doubt. Accordingly, even if we were to find that the police conducted an unlawful inventory search of the vehicle, such constitutional violation would not be grounds for reversal of appellee's conviction in light of the overwhelming evidence of his guilt. At trial, the prosecution presented the testimony of Officers Saler and Clary concerning the circumstances surrounding appellee's arrest. As previously discussed, both officers witnessed appellee toss an item from his right hand to the ground. Officer Saler was additionally able to identify the item in the hand of appellee as a "clear baggie or plastic bag." When he searched the area around which appellee had stood, Officer Clary discovered only a plastic bag containing the crack cocaine. The evidence presented at trial did not indicate that other plastic bags, or for that matter any other objects, were found in the immediate area where appellee was standing.

The jury, therefore, had evidence, solely by way of the eyewitness testimony of the officers, from which it could only have concluded that the prosecution had proven beyond a

reasonable doubt that appellee had knowingly possessed cocaine.  The contents of the black pouch could not reasonably have contributed to that conviction.  Also, no additional unrelated charges were brought against the appellee as a result of their discovery by the police.  The only relevance of the pouch and its contents came when the prosecution, in closing arguments, briefly attempted to impeach the accused's credibility and therefore make holes in his incredible version of the events that transpired the night of his arrest.[1] Accordingly, we hold that appellee's substantial rights were not prejudiced at trial since there is no reasonable possibility that the jury would have acquitted him if the contents of the black pouch had not been admitted into evidence.

On the basis of the foregoing, we reverse the judgment of the court of appeals and reinstate appellee's conviction.

Judgment reversed.

Moyer, C.J., Holmes, Douglas and Resnick, JJ., concur.
Sweeney, Wright and H. Brown, JJ., dissent.

FOOTNOTE:
1  That statement reads as follows:
"Those are the facts.  That's what the officer saw and I ask you how much credibility[,] how much credibility can you give to a guy that sits here and tells you that he doesn't use the cocaine when there's cocaine in his pouch that he takes to work everyday.  The same pouch that contains the baggies and they're identical to the baggie in State's Exhibit 1."

Wright, J., dissenting.  At first blush this does not appear to be a case of broad significance.  The majority has neither announced a new principle of law nor clarified an old one.  Yet, this case troubles me as it joins many recent state and federal cases as part of a slow, deliberate movement to significantly reduce the protections provided by the Fourth Amendment.  The danger in today's opinion is that it does not declare a departure from settled law--a departure whose merits can be vigorously debated by the bar and the public.  Rather, like many other decisions here and elsewhere, it announces the court's adherence to the precepts of the Fourth Amendment while it quietly declines to honor them.  Thus, the accepted rules governing searches and seizures are not openly challenged and changed, but are subtly weakened with each passing case.

I see two readily identifiable problems with the majority opinion:  the structure of its constitutional analysis and its conclusion that the alleged constitutional error was harmless beyond a reasonable doubt.

A

Since the United States Supreme Court formally recognized application of the harmless error doctrine to errors involving constitutional rights in Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, cases in which harmless error has been argued by the state have generally been analyzed by first considering the alleged constitutional error and, second, if an error has been found, deciding whether the error was harmless.  See, e.g., Arizona v. Fulminante (1991), 499 U.S.    , 111 S.Ct. 1246, 113 L.Ed.2d 302.  While this has not always been the case, see, e.g., State v. Tabasko (1970), 22

Ohio St.2d 36, 257 N.E.2d 744, I believe that this form of analysis places the Constitution in the proper perspective. The majority does great harm to the Fourth Amendment by elevating application of the harmless error doctrine over analysis of the alleged constitutional error. By focusing "exclusively on the proper application of the harmless error doctrine," the majority avoids confronting the Fourth Amendment. I believe that in criminal cases in which a constitutional violation is alleged, the court's first duty always is to determine whether there has indeed been a constitutional error. If the court determines that there has been an error, it may proceed, in certain cases,2 to inquire whether that error was harmless.

This may seem only to be an insignificant matter of emphasis. I see, however, three very real problems with the court's limited focus on harmless error. First, the majority implicitly holds that there has been a constitutional violation without dealing squarely with the issue. I believe that it is improper for this court ever to assume that the state has violated either the Ohio or the United States Constitution. State law enforcement officials are entitled to be told unequivocally whether the police conduct at issue in a given case is constitutionally permissible. Second, if there has been a constitutional violation it is important for the court to state specifically what it was and to explain why it occurred. The decisions of this court are the law of this state. The bench and bar must follow them in arguing and deciding future cases, those decisions concerning the Fourth Amendment define the parameters of Ohioans' reasonable expectations of privacy, and law enforcement officials are guided by these decisions in developing and carrying out their practices and policies. Third, and most important, the harmless error doctrine is but a narrow exception to the exclusionary rule and it should be treated as such. To give harmless error analysis top billing in a Fourth Amendment case is to trivialize the alleged constitutional error. The court's treatment of this case seems to indicate, as United States Supreme Court Justice Robert Jackson warned, "that Fourth Amendment freedoms are tacitly marked as secondary rights, to be relegated to a deferred position." Brinager v. United States (1949), 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879, 1893 (Jackson, J., dissenting).

In this case, the warrantless search of Brown's van clearly violated the Fourth Amendment. "It remains a 'cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions."'" California v. Acevedo (1991) 500 U.S.   ,   , 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619, 634. The state argues that the inventory search and the inevitable discovery exceptions to the warrant requirement are applicable in this case. I disagree.

To be valid, an inventory search of a vehicle "must be conducted in good faith and in accordance with reasonable standardized procedure(s) or established routine." State v. Hathman (1992), 65 Ohio St.3d 403,    N.E.2d    , paragraph

one of the syllabus. Further, even if an inventory search of a vehicle is valid, a closed container found in the vehicle "may only be opened as part of the inventory process if there is in existence a standardized policy or practice specifically governing the opening of such containers." Id., paragraph two of the syllabus. The purpose of these rules is to limit the discretion of individual police officers to ensure that inventory searches are not used as "a purposeful and general means of discovering evidence of crime." Colorado v. Bertine (1987), 479 U.S. 367, 376, 107 S.Ct. 738, 743, 93 L.Ed.2d 739, 749 (Blackmun, J., concurring). To satisfy the requirements of the Constitution, a standardized procedure or routine must limit an officer's discretion in two ways. "First, it must limit the officer's discretion regarding whether to search a seized vehicle. * * * Second, [it] must limit an officer's discretion regarding the scope of an inventory search * * *." (Citations omitted; emphasis sic.) United States v. Salmon (C.A.3, 1991), 944 F.2d 1106, 1120.

In this case, the state concedes that the Canton police did not have a written policy governing the opening of closed containers during inventory searches. Moreover, there is no evidence in the record that the Canton police had anything more than a very vague inventory policy which made the arresting officers responsible for the contents of vehicles when a driver was arrested. One of the officers who arrested Brown and searched the van, in fact, testified that he was aware of no policy "concerning inventory and contents of automobiles or vans." To the extent that any policy regarding inventory searches did exist, it did not adequately limit the officers' discretion regarding their decision to search the van or the scope of that search.

The state also contends that the evidence was admissible under the inevitable discovery exception to the exclusionary rule because the police would have eventually inventoried the car and discovered the evidence. Under the inevitable discovery exception," illegally obtained evidence is properly admitted in a trial court proceeding once it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation." State v. Perkins (1985), 18 Ohio St.3d 193, 18 OBR 259, 480 N.E.2d 763, paragraph one of the syllabus.

I believe that because the police did not have a mandatory, clearly articulated inventory search policy, the inevitable discovery exception cannot apply. In the absence of a standard police policy requiring an inventory search and defining the parameters of the search, it was never inevitable that the search in question here would occur. Without a standardized practice or established routine, individual police officers have the discretion to decide whether to conduct an inventory search. The factors the police take into account on their own in deciding whether to inventory a car are not subject to any objective judicial evaluation. The basic principle of the inventory search exception is that an articulated policy removes the discretion of the police from the determination whether and how thoroughly to search an impounded vehicle. The search of Brown's van and the black leather bag found in the van was "inevitable" only because the

police later testified that they inevitably would have searched them. In fact, the search would have been inevitable only if a standardized policy required the police to inventory the vehicle and the contents of all of the closed containers in the vehicle. Because the record shows that no such policy existed, I cannot conclude that any of the evidence found in the van was admissible under the inevitable discovery exception.

Because the search of Brown's van does not fall within any of the exceptions to the warrant requirement, I would hold that the evidence found in the van was illegally seized and improperly admitted at trial.

B

In Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, the United States Supreme Court formally recognized the application of the harmless error rule to constitutional errors. The rule announced by the court was that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (Emphasis added.) Id. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710-711. In Chambers v. Maroney (1970), 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, the court affirmed that the admission of evidence obtained in violation of the Fourth Amendment can be subject to harmless error analysis.

Appellate courts have taken three basic approaches to harmless error analysis in Fourth Amendment cases: (1) some have emphasized the nature and relevance of the tainted evidence; (2) some have emphasized the strength of the untainted evidence; and (3) most have attempted to compare the probable effect of the tainted evidence with the strength of the untainted evidence. 4 LaFave, Search and Seizure, A Treatise on the Fourth Amendment (2 Ed. 1987) 531-537. I believe the third approach to be the best because it is designed to assess pragmatically the impact of the tainted evidence on the trial as a whole. The Illinois Supreme Court explained this method of analysis:

"In considering whether constitutional error constitutes harmless error beyond a reasonable doubt *** it is not enough that the erroneously admitted evidence be considered merely cumulative or that there be other evidence in the record sufficient to support the conviction. *** The inquiry of a court of review should not be as to the amount of untainted evidence as compared to the amount of tainted evidence. The focus should rather be upon the character and quality of the illegally obtained evidence as it relates to the other evidence bearing on the same issue and the court should appraise the possible impact upon the jury of the wrongfully obtained evidence." (Emphasis added.) People v. Black (1972), 52 Ill.2d 544, 555, 288 N.E.2d 376, 383.

It is important to remember that even using this approach, an appellate court can never be completely certain that a given error was harmless. Professor Stephen Saltzburg, an authority on evidence and trial practice, made this observation:

"[W]hen an evidentiary error occurs in the course of a trial, it disturbs [defense counsel's] delicately balanced decision-making process. The abnegation of a particular rule upon which the defense relied may inflict more damage than

initially appears.  A meritorious line of defense may be dropped, an important witness held back, or entire strategies abandoned even though they should prevail.  The impact of the error upon the defendant's case may be amplified by the fact that because the error may be held harmless few lawyers will themselves attempt to depend or advise clients to depend on the appellate court's setting the record straight.  It is much more likely that trial strategy will change to accommodate rulings of the trial court, however erroneous."  Saltzburg, The Harm of Harmless Error (1973), 59 Va.L.Rev. 988, 990.

In light of the great difficulty in accurately determining the effect of erroneously admitted evidence, appellate courts must be careful to apply the harmless error doctrine only in the clearest cases.  Harmless error should only be found when the state's case is airtight even without the tainted evidence and the tainted evidence cannot have materially influenced the jury.  "[W]e must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one."  Chapman, supra, at 22, 87 S.Ct. at 827, 17 L.Ed.2d at 710.

In this case, a comparison of the probable effect of the tainted evidence and the strength of the untainted evidence leads me to the firm conclusion that the admission of the tainted evidence was not harmless beyond a reasonable doubt. Brown was charged with drug abuse, which required the state to prove that he knowingly obtained, possessed, or used cocaine. The state sought to prove only that Brown obtained and possessed cocaine.  The evidence presented by the state can be briefly summarized:  The police officers who arrested Brown testified that they saw him throw something to the ground as they approached him.  The officers searched the area and discovered a small zip lock bags containing crack cocaine.  The officers then searched the van Brown had been driving and found a black leather pouch which contained a plastic film canister, fourteen zip lock bag like the one containing the crack, and a trace amount of cocaine.  The bag containing the crack and the contents of the black leather pouch were introduced as evidence at trial.

Brown's defense was that the crack cocaine was not his. He testified that he did not throw the bag containing the crack to the ground as the police approached him, that the bag was never in his possession, and that he had never used crack cocaine.  To support his argument, his attorney stressed to the jury that the state did not initially request the police lab to check the bag containing the crack for fingerprints, nor did the lab find any fingerprints when it ultimately examined the bag.

In this debate over whether the crack cocaine belonged to Brown the physical evidence seized from Brown's van is absolutely crucial to the state's case.  Without the black leather pouch and the fourteen plastic bags, the state's evidence directly implicating Brown is limited to the oral testimony of the two arresting officers.  Without the evidence from the van, the jury would have been presented with conflicting oral testimony:  the officers' word against Brown's

word (coupled with the fact that there were no fingerprints on the bag containing the crack).

When the evidence found in Brown's van is before the jury, however, the entire complexion of the case changes. The oral testimony of the arresting officers is buttressed by physical evidence which links Brown to the bag containing the crack. The importance of this evidence was not missed by the prosecutor. In his final point to the jury during the state's closing argument, he sarcastically responded to Brown's defense by expressly raising the relationship between the bag containing the crack and the bag found in Brown's van:

"And I suppose you know it's a coincidence that the bag that contains this crack cocaine this bag is identical identical to the bags that Mr. Brown had in his pouch that he admitted he owned. * * * For some reason they picked Bergen Brown out of all the residents of Canton, Ohio and I came in here and said boy Bergen was standing there and just matter of fact we found this bag laying [sic] there so we're going to say that he dropped it and coincidentally this bag is identical to the bag that Mr. Brown has in his pouch that he admits is his. * * *

"Those are the facts. That's what the officer saw and I ask you how much credibility[,] how much credibility can you give to a guy that sits here and tells you that he doesn't use the cocaine when there's cocaine in his pouch that he takes to work everyday. The same pouch that contains the baggies and they're identical to the baggie in State's Exhibit 1."

The evidence found in the van was highly relevant, extremely strong, and not cumulative. The evidence was relevant because it directly countered Brown's defense that the bag containing the crack was not his and because the state used it to directly challenge Brown's credibility as a witness. The evidence was strong because it was physical evidence which Brown admitted belonged to him. And the evidence was not cumulative because no other physical evidence introduced by the state connected Brown to the crack.

Contrary to the majority's view, I do not find the remaining evidence to be "overwhelming." With the exception of the evidence found in the van, the state's case against Brown relied entirely on oral testimony by the two arresting officers that they saw Brown drop the drugs. This testimony was based on a fleeting glimpse at night.3

Brown's conviction depended on the jury's resolution of the credibility of the witnesses. I cannot say that this determination was not influenced by the physical evidence illegally seized from Brown's van and erroneously admitted by the trial court. "There is thus at least 'a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Stoner v. California (1964), 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856, 861, fn.8 (quoting Fahy v. Connecticut [1963], 375 U.S. 85, 86, 84 S.Ct. 229, 230, 11 L.Ed.2d 171, 173).

C

Overzealous use of the harmless error doctrine profoundly weakens the deterrent effect of the Fourth Amendment. If the state feels that it can introduce illegally obtained evidence with impunity it will see little reason to avoid infringing on

our Fourth Amendment rights during criminal investigations.

Because the warrantless search of Brown's van did not fall within any of the exceptions to the warrant requirement, I would hold that the evidence discovered was erroneously admitted at trial. Because that evidence bore directly and influentially on material determinations made by the jury, I would hold that the error was not harmless beyond a reasonable doubt. The judgment of the court of appeals should be affirmed. I respectfully dissent.

Sweeney and H. Brown, JJ., concur in the foregoing dissenting opinion.

FOOTNOTES:

2 "[T]here are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error * * *." Chapman, supra, at 23, 87 S.Ct. at 827-828, 17 L.Ed.2d at 710 (citing examples from United States Supreme Court cases preceding Chapman).

3 The case cited by the majority in support of its conclusion is factually distinguishable. I believe that the oral testimony in State v. Tabasko (1970), 22 Ohio St.2d 36, 257 N.E.2d 744, was substantially more compelling than the testimony in this case for two reasons: First, the three witnesses in Tabasko were unbiased--they were private citizens with no interest in the outcome of the trial. Second, in Tabasko the factual issue before the jury was whether the witnesses themselves had been permitted to use narcotics in the defendant's home. The witnesses' testimony was based on their own actions, not on their perceptions of the defendant's actions. In contrast, the police officers who arrested Brown cannot be considered completely unbiased--they were active participants in the arrest and conviction of the defendant. Moreover, their crucial testimony did not recount their own actions, but rather was based entirely on their perceptions of Brown's actions.