OPINION
{¶ 1} Defendant-appellant, Glenn Michael Walker, appeals from a judgment of the Franklin County Court of Common Pleas, wherein a jury convicted him of murder, carrying a concealed weapon, and tampering with evidence. Finding no reversible error, we affirm the judgment of the common pleas court.
 {¶ 2} By indictment filed October 17, 2003, defendant was charged with one count of murder with two firearm specifications, one count of carrying a concealed weapon, and one count of tampering with evidence. Thereafter, a jury trial was held.
 {¶ 3} According to the state's evidence, on October 8, 2003, Paul Woodward and Ron Woods were traveling in Woods' car, a black Saturn, to the apartment of Jonathan Dannemann, which was located on Stiles Avenue in Franklin County, Ohio. (Tr. 53; 85; 100; 117; 127-128; 148-149.) When Woodward and Woods arrived at the parking lot of the apartment building, Woodward observed two cars "back[ing] out of the apartments" and a male who "threw his arms up," (Tr. 53), which possibly signaled aggression or, alternatively, a different meaning such as "[w]hat's up?" (Tr. 54.) Woodward did not recognize the male that signaled. (Id.) Woodward also observed an undetermined number of people around a "dark purplish" car and a white car. (Tr. 55.)
 {¶ 4} According to Woods, after pulling into the parking lot of the apartment building, he observed two cars with "a bunch of people." (Tr. 85.) As he and Woodward pulled into the parking lot, people in the cars exited and approached them with their hands up. (Id.)
 {¶ 5} After Woodward and Woods exited Woods' car, they were instructed to leave and that if they did not comply, they would be hurt. (Tr. 54; 86.) Thereafter, Woodward and Woods re-entered Woods' car, drove to the front of the apartment complex, parked, and went toward Dannemann's apartment. (Tr. 55; 85-86.) From outside Dannemann's apartment, Woodward and Woods yelled through a window to Dannemann's roommate, Nicholas McGinnis, informing him of the events in the parking lot. (Tr. 119.) McGinnis then told Dannemann about the happenings in the parking lot. (Tr. 120.) Woodward and Woods next entered Dannemann's apartment. (Tr. 55-56; 86-87; 119; 129.) After hearing about the incident, Dannemann became upset and went outside and Woodward, Woods, and McGinnis, followed him. (Tr. 56; 88.)
 {¶ 6} According to Woods, after walking downstairs, Woods saw that one of the cars had pulled in front of the apartment building alongside his car. (Tr. 88.) The other car, a white car, had partly pulled out of the driveway. (Id.)
 {¶ 7} Dannemann walked in front of the purple car, moved to the driver's side of the car, exchanged words with defendant who was the driver of the purple car, and then punched defendant. (Tr. 56-57; 88; 121.) At the time Dannemann punched defendant, Woodward and Woods were on the driver's side of the car and McGinnis was on the passenger side of the car. (Tr. 89; 121-122; 124.) Neither Woods, Woodward, or McGinnis were in front of the purple car. (Tr. 89; 124.) Furthermore, neither Woods, Woodward, McGinnis, or Dannemann were armed. (Tr. 90.)
 {¶ 8} Thereafter, defendant "pulled up a pistol," opened the car door, and shot Dannemann. (Tr. 57; 89; 121.) After the shooting, Woodward and Woods ran around the apartment building where they observed the purple car and white car being driven away. (Tr. 57; 90; 92.) According to McGinnis, following the shooting:
[I] looked up and that's when the car pulled off. Everybody started scrambling toward the apartments and behind the apartments, and that's when the white car pulled around and started breaking, [sic] stopping and breaking, [sic] yelling you know, "What's up," you know, yelling, you know, like they're bad. And they just kept stopping and breaking [sic].
(Tr. 122.) Thereafter, McGinnis heard a scream, investigated, and found Dannemann lying on the floor in a doorway of an apartment. (Tr. 122-123.)
 {¶ 9} After hearing a gunshot, Joel Sonnenfroh, resident manager of the apartment complex, looked out the window of his apartment where he observed a purple car and a white car fleeing. (Tr. 149; 152.) Sonnefroh also observed McGinnis who had been standing on the passenger side of the purple car and he observed Dannemann fleeing from the driver's side of the purple car. (Tr. 152.) When Sonnefroh went to the front door of his apartment, he discovered Dannemann who had already opened the door. (Id.) After informing Sonnenfroh that he had been shot, Dannemann fell to the floor. (Tr. 152, 155.) Thereafter, Sonnenfroh directed others to call 911 and to bring towels to stop the bleeding from Dannemann's body. (Tr. 155.) After approximately two minutes, Dannemann began to lose consciousness and Sonnenfroh then began CPR. (Id.) According to Sonnenfroh, he continued performing CPR until an ambulance arrived. (Id.)
 {¶ 10} Dannemann was later pronounced dead. (Tr. 190.) According to the former deputy coroner who performed the autopsy of Dannemann, he died from a gunshot wound of the torso that perforated his trachea, aorta, and left lung. (Tr. 188-189.) Based upon the injury, the former deputy coroner estimated that Danneman survived only "a few minutes" after he was shot. (Tr. 190-191.)
 {¶ 11} After responding to the scene of the shooting, sheriff deputies began an investigation. (Tr. 59; 92.) Two days after the shooting, Woodward made an out-of-court identification from a photo array. (Tr. 60-61; 243.) That same day Woods also made an out-of-court identification from a photo array. (Tr. 93; 243.)
 {¶ 12} Defendant was later apprehended at his mother and stepfather's house after defendant presented himself to detectives. (Tr. 244; 268; 317-318.) According to Detective Drew McEvoy, defendant voluntarily spoke to detectives about the events of October 8, 2003. (Tr. 246.) Defendant stated to detectives that, as he pulled in front of the apartment complex, a group rushed his car, which was stopped with its windows open. Defendant informed detectives that, while attempting to exit the car, he opened his car door and was punched several more times by more than one person. According to Detective McEvoy, defendant informed detectives that he feared for his safety and the safety of his younger brother who was also in the vehicle. Defendant informed detectives that he reached under the driver's seat, pulled out a gun, and fired one shot. (Tr. 246-247; 260.) Defendant also informed detectives that because he was "freaking out," he gave Shane Amos, a person in the car behind him, the weapon that he used in the shooting, a highpoint .9 millimeter gun. (Tr. 247-248; 264.) However, subsequent to the shooting, this weapon was not recovered (Tr. 248), and Shane Amos was later unavailable, having purportedly moved to Texas following the shooting. (Tr. 264.) According to Detective McEvoy, defendant's admission that the gun used in the shooting was a .9 millimeter weapon was consistent with evidence that was recovered, namely, bullet fragments that were recovered from Dannemann's body and a shell casing found at the scene of the shooting. (Tr. 276.) Defendant also admitted to detectives that he used drugs several times a day. (Tr. 248; 365.) However, defendant denied that he was "high" when he shot Dannemann. (Tr. 365-366; 370-371.)
 {¶ 13} At trial, defendant testified on his own behalf. Although admitting he shot Dannemann, defendant argued he acted in self-defense. (Tr. 320.) According to defendant, on October 8, 2003, he and his younger brother, Matthew ("Bub"), traveled to the back parking lot of Dannemann's apartment complex in a purple Neon, which was defendant's wife's car. (Tr. 320; 321; 327; 328.) "Ryan," "Ryan's brother," and Shane Amos were in the back parking lot in another car, a white Beretta. (Tr. 321; 329.) At some point, Ryan exited his car and got into the back of the car that defendant was driving. (Tr. 329.) Later, after a gold-colored Saturn approached, Ryan exited the purple Neon and he and Amos approached the people in the Saturn and exchanged words with them. (Tr. 329.) Defendant did not hear this conversation. (Tr. 330.) Following this conversation, Ryan and Amos entered the white Beretta. (Tr. 330-331.) Thereafter, defendant and his brother drove the purple Neon from the parking lot and they were followed by Ryan, Ryan's brother, and Amos in the white Beretta. (Tr. 332.)
 {¶ 14} Defendant admitted that he carried a gun for self-defense purposes because he previously had been robbed. (Tr. 325-326.) According to defendant, after pulling out of the back parking lot, defendant saw Dannemann approaching him with "four or five other guys." (Tr. 332, 335.) According to defendant, Dannemann was screaming and in a rage. (Tr. 336.) Defendant was unable to drive forward because Dannemann's friends were in front of the car and prevented him from pulling forward. (Id.) Defendant also was unable to shift his car into reverse to effect an escape because the white Beretta was behind the car he was driving. (Tr. 346.)
 {¶ 15} According to defendant, Dannemann and someone else punched him in his face and head about "four or five times." (Tr. 336-337.) Defendant attempted to exit the car (Tr. 337); however, he was unable to exit the car "[b]ecause there was like a tug of war going on with the door." (Tr. 338; 342.) Defendant stated he "was scared for my life and my brother's life." (Tr. 340.) According to defendant, it did not appear that the attack would stop "until they did great bodily harm to one of us." (Tr. 346.)
 {¶ 16} Thereafter, defendant pulled out a gun from underneath his seat "[t]o scare Jonathan Dannemann and his friends away." (Tr. 340-341.) According to defendant, he could not see whether Dannemann or those accompanying him carried weapons. (Tr. 342; 347-348; 368.) Defendant admitted to discharging the gun once, aiming the gun at "[b]asically whoever was attacking me," (Tr. 343), and he testified that the assault against him did not stop before the gun was discharged. (Tr. 342.) Following the shooting, defendant drove away. (Tr. 344.) Defendant admitted to being "shocked" after the shooting. (Tr. 345.) Defendant also admitted that he gave the gun used in the shooting to Amos because defendant "was freaking out." (Tr. 350; 369.) However, according to defendant, he did not instruct Amos or any other person to alter, conceal, or remove the gun so that it would be unavailable to law enforcement. (Id.) According to defendant, he did not have any personal knowledge as to what Amos did with the gun or where Amos put the gun. (Tr. 351.)
 {¶ 17} After deliberation, the jury found defendant guilty of all charges as contained in the indictment. By judgment entry, the trial court sentenced defendant to 15 years to life as to the murder conviction with three years for firearm specification, 15 months as to the conviction for carrying a concealed weapon, and one year as to the conviction for tampering with evidence. The trial court ordered the sentences for murder, carrying a concealed weapon, and tampering with evidence to be served concurrently. From these convictions, defendant now appeals and raises four errors for our consideration:
FIRST ASSIGNMENT OF ERROR: Appellant was denied the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution.
SECOND ASSIGNMENT OF ERROR: Appellant's murder conviction was not supported by the evidence in that the affirmative defense of self-defense was proven as a matter of law. Furthermore conviction was against the manifest weight of the evidence.
THIRD ASSIGNMENT OF ERROR: Appellant's carrying concealed weapons conviction was not supported by the evidence and was against the manifest weight of the evidence.
FOURTH ASSIGNMENT OF ERROR: Appellant's tampering with evidence conviction was not supported by the evidence and was against the manifest weight of the evidence.
 {¶ 18} Defendant's first assignment of error asserts that he was denied effective assistance of counsel under both the United States Constitution and the Ohio Constitution.
 {¶ 19} "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington (1984),466 U.S. 668, 686, 104 S.Ct. 2052.
 {¶ 20} "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, at 689. (Citation omitted.) "`Even debatable trial tactics do not constitute ineffective assistance of trial counsel.'" State v. Jordan, Franklin App. No. 04AP-827, 2005-Ohio-3790, at ¶ 17, quoting State v. Nichols (1996), 116 Ohio App.3d 759, 764.
 {¶ 21} In Strickland, the Supreme Court of the United States instructed:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687; see, also, State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, certiorari denied (1990),497 U.S. 1011, 110 S.Ct. 3258. Cf. State v. Lytle (1976), 48 Ohio St.2d 391,395, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, quotingState v. Hester (1976), 45 Ohio St.2d 71, 79 (stating that "`[i]n formulating a test for effective counsel pursuant to the Fifth, Sixth andFourteenth Amendments, and Sections 10 and 16 of Article I of the Ohio Constitution * * * we hold the test to be whether the accused, under all the circumstances, including the fact that he had retained counsel, had a fair trial and substantial justice was done'").
 {¶ 22} Defendant argues that trial counsel's performance was deficient because: (1) he failed to file and press for a hearing on a motion to suppress identification; (2) he "blundered" in his opening statement; (3) he failed to object when photos used to obtain an out-of-court identification were referred to as "mug shots"; (4) he drew an admonition from the bench to not use profane language; (5) he failed to investigate and present to the jury in a coherent manner information that the victim anticipated a fight with his girlfriend's former boyfriend, and thus the victim may have mistaken defendant for that individual; (6) he suggested to the jury that the state was remiss by not pursuing forensic testing, yet he failed to exercise defendant's right to analysis, either through a request to the Bureau of Criminal Identification and Investigation or for testing by an independent laboratory; (7) he failed to move for acquittal pursuant to Crim.R. 29 at the close of the state's case; and (8) he made additional counterproductive choices. Defendant further asserts that trial counsel's purported errors prejudiced the defense.
 {¶ 23} "`[F]ailure to file a suppression motion does not constitute per se ineffective assistance of counsel.'" State v. Madrigal (2000),87 Ohio St.3d 378, 389, certiorari denied, 531 U.S. 838, 121 S.Ct. 99, quoting Kimmelman v. Morrison (1986), 477 U.S. 365, 384, 106 S.Ct. 2574. "`Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion.'" State v. Tibbetts (2001), 92 Ohio St.3d 146, 166, certiorari denied (2002), 534 U.S. 1144, 122 S.Ct. 1100, quoting State v. Gibson
(1980), 69 Ohio App.2d 91, 95. "Failure to file a motion to suppress constitutes ineffective assistance of counsel only if, based on the record, the motion would have been granted." State v. Randall, Franklin App. No. 03AP-352, 2003-Ohio-6111, at ¶ 15. Cf. State v. Delmonico,
Ashtabula App. No. 2003-A-0022, 2005-Ohio-2902, at ¶ 20 (stating that to establish prejudice under Strickland, "an appellant must prove more than a mere possibility that the motion could have been granted; rather, he or she must show a reasonable probability that, but for the omission, the result of the proceedings would have been different"). (Emphasis sic.)
 {¶ 24} Here, according to Detective McEvoy, random photo arrays in this case were generated by a computer using parameters such as age, weight, hair color, and facial hair. The photo arrays were shown to Woods and Woodward two days after the shooting. The witnesses were also instructed that if they selected a photo, then "they have to be positive" in their identification. (Tr. 240-243; 242.) Moreover, at trial, responding to a query about the amount of time Woodward had to observe defendant on the day of the shooting, Woodward testified that "I got a real — I couldn't really explain how much time, but, you know, I was in front of him, you know, and I seen him really good, so —." (Tr. 61.) Based upon our review of the record, including the photo arrays, we find no evidence in the record that if a defense motion to suppress the out-of-court identifications had been filed, it would have been successful. Absent such a finding, we therefore cannot conclude that, based upon this record, but for trial counsel's failure to move to suppress the out-of-court identifications, the result of the proceedings would have been different.
 {¶ 25} Accordingly, appellant's assertion that trial counsel's failure to move to suppress the out-of-court identifications constitutes ineffective assistance of counsel is not well-taken.
 {¶ 26} Defendant also asserts that trial counsel "blundered" in his opening statement, thereby denying defendant effective assistance of counsel.
 {¶ 27} In his opening statement, defense counsel, in relevant part, stated:
How are you? Two days before this shooting, the decedent in this case — his name is Jonathan Dannemann — I kind of find it interesting that I didn't hear the state of Ohio this morning tell you who was going to come into this courtroom to testify —
MS. PARRIS: Judge, may we approach?
THE COURT: Yes, you may. Come on over, please.
(Tr. 43.)
 {¶ 28} Thereafter, outside the hearing of the jury, a bench conference was held, wherein the trial court reminded defense counsel that argumentation was not permitted during an opening statement, and the trial court also made an evidentiary ruling. (Tr. 44-47.) Following the bench conference, defense counsel continued with his opening statement.
 {¶ 29} Based upon this evidence, we cannot conclude that defense counsel's conduct in his opening statement deprived defendant of a fair trial, a trial whose result is reliable. See Strickland, at 687. Moreover, we cannot conclude that there is a reasonable probability that, but for defense counsel's error in opening statement, the result of the proceeding would have been different. See id. at 694; Bradley, at paragraph three of the syllabus.
 {¶ 30} Accordingly, defendant's assertion that defense counsel's "blunder" during opening statement constitutes ineffective assistance of counsel is not well-taken.
 {¶ 31} Defendant also asserts that defense counsel's failure to object when photos used to obtain an out-of-court identification were referred to as "mug shots" constitutes ineffective assistance of counsel.
 {¶ 32} At trial, when testifying about his out-of-court identification of defendant, Woodward testified:
* * * And I was outside, and they were talking to, I think it was, Susan that was out there, and they asked if I was Paul, and I said, Yes, and they asked me to take a look at, you know, random sheets of mug shots, you know, see if I could identify — you know, see if I could — and I chose a picture, you know, who I thought it was, and they asked me how sure was I, and I said 99.9 percent, you know.
(Tr. 60.)
 {¶ 33} Woodward further testified as follows:
Q. [By Assistant Prosecutor Parris] I'm going to hand you state's exhibit A-2, do you recognize that?
A. Yes.
Q. What is it?
A. That is the picture I chose from the mug shots.
(Tr. 61.)
 {¶ 34} In State v. Mobley (Apr. 5, 2002), Montgomery App. No. 18878, after receiving the defendant's name from an anonymous tip, a police detective with 18 years' experience testified that "[w]ith that information, I was able to obtain a photograph which we, uh . . . Of a mug shot photography of Mr. Mobley. He was already in our system. Anybody that's arrested at — at the Montgomery County Jail."
 {¶ 35} Thereafter, defense counsel objected and requested a mistrial. Sustaining the defense objection but denying the motion for a mistrial, the trial court gave a curative instruction to the jury. On appeal, the defendant asserted that the trial court erred by denying defendant's motion for a mistrial based upon the severely prejudicial nature of the police detective's testimony.
 {¶ 36} Agreeing that the police detective's answer was in error and observing that the trial court issued a curative instruction, the Mobley
court observed that "even if the trial court's instruction had not cured the error, the detective's improper statement was harmless error." Id. The Mobley court further observed:
* * * Constitutional errors are "harmless beyond a reasonable doubt and [do] not provide grounds for reversal of the conviction where the pertinent testimony of the witnesses at the trial is not the product of [the error] and is overwhelmingly sufficient to independently establish the elements of the offense beyond a reasonable doubt." State v. Brown
(1992), 65 Ohio St.3d 483, 485, 605 N.E. 2d 46, quoting State v. Tabasko
(1970), 22 Ohio St.2d 36, 257 N.E. 2d 744. Additionally, a defendant is guaranteed only a fair trial, not a perfect one. State v. Lott (1990),51 Ohio St.3d 160, 165, 55 N.E. 2d 293.
Id. (Brackets sic.)
 {¶ 37} In this case, even though defense counsel failed to object to the term "mug shot," we cannot conclude that there is a reasonable probability that, but for defense counsel's failure to object to Woodward's reference to "mug shot," the result of the proceeding would have been different. See Strickland, at 694; Bradley, at paragraph three of the syllabus. Unlike in Mobley, Woodward did not directly state that defendant had a past criminal history when referring to defendant's photo in the array as "mug shot." By contrast, in Mobley, the police detective directly suggested that Mobley had a criminal history by stating that the defendant's photo was obtained during a previous arrest at the Montgomery County Jail. Nonetheless, despite this error, the Mobley court found that the police detective's improper testimony constituted harmless error.
 {¶ 38} The Supreme Court of Ohio has held:
Under R.C. 2945.55, where identification of the defendant is in issue, a witness who on a previous occasion has selected * * * defendant's photograph from a number of photographs, may testify to such previous photographic identification if the photographs, or the photographs coupled with other testimony given on direct examination, do not provide the finder of facts with reasonable inference that defendant has had prior criminal involvement, and if the procedure of identification does not violate defendant's constitutional rights.
State v. Breedlove (1971), 26 Ohio St.2d 178, paragraph one of the syllabus.
 {¶ 39} Here, at trial both Woods and Woodward positively identified defendant as the person who shot Dannemann (Tr. 58-59; 93-94), and defendant himself admitted to shooting Dannemann. (Tr. 343.) Additionally, the random photo arrays in this case were composed using parameters such as age, weight, hair color, and facial hair and apparently were presented to witnesses in a manner consistent with established protocol. (Tr. 240-243.) Based upon this record, applying Mobley, we find that Woodward's reference to "mug shots" in his testimony constitutes harmless error. See, generally, Civ.R. 52(A) (harmless error).
 {¶ 40} Accordingly, having found that Woodward's reference to "mug shots" was harmless error, defendant's assertion that defense counsel's failure to object to Woodward's reference to "mug shot" constitutes ineffective assistance of counsel is not well-taken.
 {¶ 41} Defendant also asserts that because the trial court admonished defense counsel for his use of profane language, defense counsel was ineffective.
 {¶ 42} Here, although vulgar language earlier had been used in the trial (Tr. 77; 109), during cross-examination of Ron Woods, defense counsel used vulgar language that was not used by the witness. Such cross-examination prompted the trial court to instruct defense counsel to "clean up your mouth." (Tr. 114.) When defense counsel responded that "I'm actually using the words they use, your Honor," (id.), the trial court stated that "I haven't heard one of them say that" and "[l]et's get the cleaned-up language or we'll have a recess right now and talk about it." (Id.) To the trial court's suggestion that a recess might be needed, defense counsel stated that "[w]e don't need to." (Id.)
 {¶ 43} Here, defense counsel's response to the trial court that "I'm actually using the words they use, your Honor," suggests that defense counsel's choice of words was a strategic choice and based upon trial tactics. However, even if defense counsel's apparent lack of decorum had an adverse effect upon the jury, we cannot conclude that defense counsel's use of vulgar language constitutes ineffective assistance of counsel. See Jordan, supra, at ¶ 17, quoting Nichols, supra, at 764 (stating that "`[e]ven debatable trial tactics do not constitute ineffective assistance of trial counsel'").
 {¶ 44} Accordingly, defendant's assertion that defense counsel was ineffective due to an admonishment by the trial court to refrain from using profane language is not well-taken.
 {¶ 45} Defendant also asserts that trial counsel's failure to investigate and present to the jury in a coherent manner information that Dannemann anticipated a fight with his girlfriend's former boyfriend, and thus may have mistaken defendant for that individual, constitutes ineffective assistance of counsel.
 {¶ 46} Here, defendant contends that, prior to the fatal shooting, Dannemann anticipated a fight with his girlfriend's former boyfriend and Dannemann's girlfriend's former boyfriend drove a purple car. Because Dannemann apparently anticipated a fight with the driver of a purple car, and because defendant was driving a purple car at the time Dannemann attacked him, defendant theorizes that his claim of self-defense is bolstered because these facts provide an explanation for Dannemann's conduct.
 {¶ 47} At the time of the shooting, defendant did not know Dannemann (Tr. 333-334), and, consequently, defendant had no knowledge that Dannemman purportedly anticipated a fight with the driver of a purple car. Thus, because defendant lacked knowledge of Dannemann or whether Dannemann anticipated a fight with a driver of a purple car, establishing whether Dannemann anticipated a fight with a girlfriend's former boyfriend that drove a purple car does not advance defendant's self-defense claim.
 {¶ 48} Moreover, whether Dannemann was the first person to resort to physical violence in the altercation between defendant and Dannemann is undisputed. Thus, to some extent, whether Dannemann was predisposed for a fight because he anticipated a fight with a driver of a purple car is irrelevant because it is undisputed that Dannemann was the first person to resort to physical violence.
 {¶ 49} Nevertheless, establishing at trial whether Danneman anticipated a fight with a driver of a purple car admittedly might have had some relevance to the extent that it provided a background to defendant's testimony that Dannemann was in a "rage" when Dannemann approached defendant. (Tr. 336.)
 {¶ 50} "To succeed in setting aside a conviction premised on ineffective assistance of counsel, a petitioner must establish both constitutionally deficient performance on his attorney's part and concomitant prejudice, or, phrased another way, that the quality of legal representation at his trial was so inferior as to be objectively unreasonable, and that this incompetent lawyering redounded to his substantial detriment." United States v. McGill (C.A.1, 1993), 11 F.3d 223,226. "To avoid the shoals of ineffective assistance, an attorney's judgment need not necessarily be right, so long as it is reasonable." Id. at 227.
 {¶ 51} Here, based upon our review of the evidence, although defense counsel perhaps could have presented information to the jury differently, we cannot conclude that defense counsel's presentation to the jury that Dannemann purportedly anticipated a fight with his girlfriend's former boyfriend, and may have mistaken defendant for that individual, was so inferior as to be objectively unreasonable. SeeStrickland, at 689 (instructing that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time").
 {¶ 52} Accordingly, defendant's assertion that defense counsel's failure to investigate and present to the jury in a coherent manner information that Dannemann anticipated a fight with his girlfriend's former boyfriend constitutes ineffective assistance of counsel is not well-taken.
 {¶ 53} Defendant also asserts that defense counsel's suggestion to the jury that the state was remiss in not pursuing forensic testing and defense counsel's failure to exercise defendant's right to analysis, either through a request to the Bureau of Criminal Identification and Investigation or through a request for independent testing, constitutes ineffective assistance of counsel. Defendant argues that the results of forensic testing may have supported defendant's claim that multiple blows were struck by possibly more than one person.
 {¶ 54} "`[T]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" State v. Hartman (2001), 93 Ohio St.3d 274, 299, quoting Statev. Nicholas (1993), 66 Ohio St.3d 431, 436, citing State v. Thompson
(1987), 33 Ohio St.3d 1, 10-11.
 {¶ 55} In Wiggins v. Smith (2003), 539 U.S. 510, 123 S.Ct. 2527, the Supreme Court of the United States stated:
* * * "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."
Id. at 521-522, quoting Strickland, at 690-691.
 {¶ 56} Here, whether Dannemann struck defendant is undisputed. Because it is undisputed that Danneman struck defendant, it is not implausible that for strategic purposes defense counsel did not request forensic testing because the results of this testing may have corroborated a fact that was already undisputed, namely that Danneman struck defendant. Cf.Williams v. Taylor (2000), 529 U.S. 362, 396, 120 S.Ct. 1495 (concluding that an attorney's failure to present comparatively voluminous mitigating evidence at sentencing could not be justified as a tactical decision).
 {¶ 57} Applying a heavy measure of deference to defense counsel's decision to forego pursuing forensic testing, we find that defendant's assertion that defense counsel's decision to forego pursuing forensic testing constitutes ineffective assistance of counsel is not well-taken.
 {¶ 58} Defendant also asserts that defense counsel's failure to move for acquittal pursuant to Crim.R. 29 after the state's case-in-chief constitutes ineffective assistance of counsel.
 {¶ 59} "As a general matter, the failure of trial counsel to make a Crim.R. 29 motion does not constitute ineffective assistance of counsel when the state's case-in-chief links the defendant to the crimes of which he or she is accused." State v. McKinley, Franklin App. No. 02AP-371, 2002-Ohio-7197, at ¶ 39, citing State v. Small (May 1, 2001), Franklin App. No. 00AP-1149. "Hence, if the state's case-in-chief links the defendant to the crimes of which he or she is accused, ineffective assistance of counsel is not shown where defense counsel fails to fully argue a Crim.R. 29 motion for acquittal." McKinley, at ¶ 39.
 {¶ 60} Here, Woodward and Woods positively identified defendant as the person who shot Dannemann. Additionally, Detective McEvoy testified about defendant's admissions that, after pulling a weapon from underneath his seat, he shot Dannemann, and later gave the weapon he used to Shane Amos. After reviewing the record, we conclude that the state's case-in-chief did link defendant to the crimes for which he had been charged and, therefore, ineffective assistance of counsel has not been shown related to defense counsel's failure to move for acquittal following the state's case-in-chief.
 {¶ 61} Accordingly, we reject defendant's assertion that defense counsel's failure to move for acquittal pursuant to Crim.R. 29 after the state's case-in-chief constitutes ineffective assistance of counsel.
 {¶ 62} Defendant also asserts that defense counsel made additional counterproductive choices that constitute ineffective assistance of counsel. Specifically, defendant criticizes defense counsel for seeking a motion in limine to exclude defendant's admission to police detectives that he was involved in a drug transaction in the parking lot behind Dannemann's apartment. Defendant argues that if the jury had known that defendant's presence at the shooting was related to a drug transaction, defendant's claim that his car was surrounded would have been more understandable to the jury. Defendant also criticizes defense counsel for inartful formulation of questions and defense counsel's purported "petulant" response to the trial court's instruction to conduct an examination in a proper manner.
 {¶ 63} "To avoid the shoals of ineffective assistance, an attorney's judgment need not necessarily be right, so long as it is reasonable."McGill, supra, at 227. Here, if the jury had known that defendant was involved in a drug transaction in the parking lot behind the apartment building, the probative value of such evidence may have been substantially outweighed by danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Acknowledging that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time[,]" Strickland, at 689, defendant's assertion that defense counsel's decision to seek exclusion of defendant's admission to police detectives that he was involved in a drug transaction in the parking lot behind Dannemann's apartment constitutes ineffective assistance of counsel is not well-taken.
 {¶ 64} "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, at 689. Cf. United States v. Hasting
(1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974 (acknowledging that "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial").
 {¶ 65} Here, it is all too tempting to second-guess defense counsel's formulation of questions during trial to conclude that defense counsel's formulation of questions was unreasonable. Based upon our review of the record, defendant's assertion that defense counsel's counterproductive choices constitute ineffective assistance of counsel is not well-taken.
 {¶ 66} Accordingly, because we cannot conclude that trial counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result, we therefore overrule defendant's first assignment of error wherein defendant asserts he was denied effective assistance of counsel.
 {¶ 67} Defendant's second, third, and fourth assignments of error assert that defendant's convictions for murder, carrying a concealed weapon, and evidence tampering were against the manifest weight of the evidence and supported by legally insufficient evidence. In his second assignment of error, defendant further asserts that he proved the affirmative defense of self-defense as a matter of law.
 {¶ 68} On the trial of a criminal case, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 69} When presented with a manifest-weight argument, an appellate court engages in a limited weighing of the evidence to determine whether the fact finder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, reconsideration denied, 79 Ohio St.3d 1451; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. As the Supreme Court of Ohio stated in State v. Group,98 Ohio St.3d 248, 2002-Ohio-7247:
The question for the reviewing court [in a manifest-weight claim] is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction."
Id. at ¶ 77, quoting State v. Martin (1983), 20 Ohio App.3d 172,175. See, also, Thompkins, at 387.
 {¶ 70} Comparatively, when an appellant challenges his or her conviction as not supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds as stated in State v. Smith
(1997), 80 Ohio St.3d 89; Thompkins, at 386; Conley, supra.
 {¶ 71} R.C. 2903.02(A) provides that "[n]o person shall purposely cause the death of another * * *." According to R.C. 2903.02(D), "[w]hoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code."
 {¶ 72} Under R.C. 2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 73} Here, at trial, defendant admitted to discharging the gun once, aiming the gun at "[b]asically whoever was attacking me." (Tr. 343.) Moreover, at trial, other witnesses identified defendant as the person who fatally shot Dannemann. (Tr. 57-58; 93-94.) Thus, the jury, as the trier of fact, reasonably could conclude that defendant purposely caused the firearm to discharge, thereby killing Dannemann. Therefore, defendant's assertion that his conviction for murder is against the manifest weight of the evidence is not well-taken. Furthermore, construing the evidence in favor of the prosecution, defendant's assertion that his conviction for murder is supported by legally insufficient evidence also is not well-taken.
 {¶ 74} "In Ohio, self-defense is an affirmative defense which the defendant is required to prove by a preponderance of the evidence."Walden v. State (1989), 47 Ohio St.3d 47, 50, citing State v. Martin
(1986), 21 Ohio St.3d 91, 94, affirmed (1987), 480 U.S. 228, 107 S.Ct. 1098. "[T]he burden of proving self-defense by a preponderance of the evidence does not require the defendant to prove his innocence by disproving an element of the offense with which he is charged." Martin, supra, at 94. Rather, "[t]he elements of the crime and the existence of self-defense are separate issues." Id. "Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged." Id.
 {¶ 75} As stated by the Supreme Court of Ohio in State v. Robbins
(1979), 58 Ohio St.2d 74:
To establish self-defense, the following elements must be shown: (1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or to avoid the danger.
Id. at paragraph two of the syllabus, approving and following State v.Melchior (1978), 56 Ohio St.2d 15.
 {¶ 76} Here, although defendant and Dannemann exchanged words, Dannemann escalated the violence between himself and defendant by punching defendant. Thus, Dannemann, not defendant, was at fault in escalating the level of violence in the affray. However, it is disputed whether defendant's only means of escape from such danger was the use of deadly force.
 {¶ 77} "[I]n most cases `a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation.'"State v. Thomas (1997), 77 Ohio St.3d 323, 326, quoting State v.Williford (1990), 49 Ohio St.3d 247, 250, citing Robbins, supra, 79-81;Marts v. State (1875), 26 Ohio St. 162, 167-168. "This requirement derives from the common-law rule that the right to kill in self-defense may be exercised only if the person assaulted attempted to `retreat to the wall' whenever possible." Thomas, at 326-327, quoting Annotation, Homicide: Duty to Retreat Where Assailant and Assailed Share the Same Living Quarters (1969), 26 A.L.R.3d 1296, 1298.
 {¶ 78} Here, witnesses for the state testified: (1) Dannemann punched defendant only once before defendant shot him; (2) neither Woods, Woodward, or McGinnis punched defendant; and (3) Dannemann, Woods, Woodward, and McGinnis were not armed. (Tr. 57-58; 90; 114-115; 121; 124.) Furthermore, according to state witnesses, at the time Dannemann punched defendant, Woodward and Woods were on the driver's side of the car and McGinnis was on the passenger side of the car. (Tr. 89; 121-122; 124.) Neither Woods, Woodward, or McGinnis were in front of the car. (Tr. 89; 124.)
 {¶ 79} "The weight to be given evidence and the credibility of the witnesses are primarily decisions for the jury." State v. Jackson
(1986), 22 Ohio St.3d 281, 285, certiorari denied (1987), 480 U.S. 917,107 S.Ct. 1370, citing DeHass, supra, at paragraph one of the syllabus. Here, if the jury believed the testimony of the state witnesses, the jury, as the trier of fact, reasonably could conclude that neither Dannemann, Woods, Woodward or McGinnis blocked the front of the car that defendant was driving, thereby preventing defendant's egress. Thus, if defendant's egress was not blocked, then the jury reasonably could conclude that the use of deadly force was not defendant's only means of escape. Furthermore, if the jury believed the testimony of Woods, Woodward, and McGinnis, the jury could have also reasonably questioned whether defendant's belief that he was in imminent danger of death or great bodily harm was bona fide.
 {¶ 80} Therefore, having so concluded, the jury reasonably could find that defendant did not prove by a preponderance of the evidence that he acted in self-defense. Thus, we find unpersuasive defendant's contention that the affirmative defense of self-defense was proven as a matter of law.
 {¶ 81} Accordingly, having found the affirmative defense of self-defense was not proven as a matter of law and having found that defendant's conviction for murder is not against the manifest weight of the evidence and is not supported by insufficient evidence, we therefore overrule defendant's second assignment of error.
 {¶ 82} Under former R.C. 2923.12(A),[1] "[n]o person shall knowingly carry or have, concealed on his or her person or concealed ready at hand, any deadly weapon or dangerous ordnance." According to former R.C.2923.12(D), "if the weapon involved is a firearm that is either loaded or for which the offender has ammunition ready at hand, or if the weapon involved is dangerous ordnance, carrying concealed weapons is a felony of the fourth degree."
 {¶ 83} Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 84} In State v. Graham (Feb. 10, 1998), Franklin App. No. 97APA04-541 (Close, J., dissenting), this court stated:
A weapon need not be completely invisible to be concealed for purposes of R.C. 2923.12. State v. Almalik (1987), 41 Ohio App.3d 101,534 N.E. 2d 898; State v. Coker (1984), 15 Ohio App.3d 97,472 N.E.2d 747. Indeed, a partially concealed weapon constitutes a "concealed" weapon within the meaning of R.C. 2923.12. Amalik; Coker,supra; State v. Pettit (1969), 20 Ohio App.2d 170, 252 N.E. 2d 325;State v. Davis (1984), 15 Ohio App.3d 64, 472 N.E. 2d 751. However, the test for determining whether a weapon, including a "partially concealed" weapon, is concealed for purposes of R.C. 2923.12 is stated in Coker:
"It is not necessary to prove that the shotgun was carried in such manner or in such location as to give absolutely no notice of its presence under any kind of observation. Rather, it is sufficient to support a conviction of carrying a concealed weapon to prove only that ordinary observation would give no notice of its presence. This is a question of fact to be resolved by the trier of fact. There must be an evidentiary basis established by the proof upon which the jury could find that the weapon was concealed. * * *" Id. at 98.
Thus, a weapon is concealed if "ordinary observation would give no notice of its presence." Id. See, also, Pettit, supra, at 173-174 ("* * * a weapon is concealed if it is so situated as not to be discernible by ordinary observation by those near enough to see it if it were not concealed.").
 {¶ 85} On direct examination, Ron Woods testified:
Q. [By assistant prosecuting attorney Parris] After John walked up to the car and punched the driver, what did the driver do, if anything?
A. I think he kicked the door open, put [the car] in park, and I think he reached under the seat. All I seen, I seen him raise his hands up and then I heard a bang, and that's it. It just happened really fast.
(Tr. 89.)
 {¶ 86} On direct examination, defendant himself testified:
Q. [By defense counsel Cicero] At some point in time, did you make a decision in your mind to do something?
A. Yes.
Q. And what was that decision?
A. To pull out the gun.
Q. And what did you do with that gun?
A. Pulled it out from underneath my seat.
(Tr. 340.)
 {¶ 87} Here, defendant's testimony that he pulled the gun from underneath his car seat and Woods' testimony that defendant reached under his car seat prior to the shooting support a reasonable inference that the weapon was situated such that it was not discernible by ordinary observation and ordinary observation would have given no notice of its presence. Thus, the jury, as the trier of fact, reasonably could conclude that defendant concealed ready at hand a deadly weapon that was loaded in violation of former R.C. 2923.12.
 {¶ 88} Defendant's contention that his conviction for carrying a concealed weapon is against the manifest weight of the evidence therefore is not well-taken. Furthermore, construing the evidence in favor of the prosecution, defendant's contention that his conviction for carrying a concealed weapon is supported by insufficient evidence also is not well-taken.
 {¶ 89} Accordingly, having concluded that defendant's conviction for carrying a concealed weapon is not against the manifest weight of the evidence and defendant's conviction for carrying a concealed weapon is not supported by legally insufficient evidence, we overrule defendant's third assignment of error.
 {¶ 90} R.C. 2921.12 provides:
(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;
* * *
(B) Whoever violates this section is guilty of tampering with evidence, a felony of the third degree.
 {¶ 91} In State v. Copley, Franklin App. No. 04AP-511, 2005-Ohio-896, appeal not allowed, 106 Ohio St.3d 1463, 2005-Ohio-3490, this court considered an appeal from jury convictions of murder with a firearm specification and tampering with evidence. In Copley, the defendant testified that, after fatally shooting another, he dropped the firearm on the ground near a fence on his way to a nearby gas station. Id. at ¶ 12. Law enforcement authorities never recovered the firearm. Id.
 {¶ 92} Concluding that the defendant's conviction for tampering with evidence should not be reversed, the Copley court stated that "appellants involvement in the shooting triggered cause to know that law enforcement would investigate the incident and would be interested in the firearm. Nonetheless, appellant disposed of the firearm, and law enforcement never recovered it. Accordingly, we will not reverse the tampering with evidence conviction." Id. at ¶ 60.
 {¶ 93} Similarly, here, defendant's involvement in the shooting of Dannemann triggered cause for defendant to know that law enforcement authorities would investigate the incident and would be interested in the firearm used in the shooting. Nevertheless, defendant disposed of the firearm by giving it to Shane Amos. Moreover, under the facts and circumstances of this case, we find that a jury reasonably could infer that defendant concealed the handgun with purpose to impair its value or availability as evidence in the law enforcement investigation that would likely follow such a shooting as this one.
 {¶ 94} In State v. Jones, Franklin App. No. 02AP-1390, 2003-Ohio-5994, appeal not allowed (2004), 102 Ohio St.3d 1409, 2004-Ohio-1763, the defendant appealed from convictions for complicity to commit murder with firearm specification, tampering with evidence, and having a weapon while under disability. Finding that "there was sufficient evidence upon which the jury could reasonably conclude that all of the elements of the offense of tampering with evidence were present," id. at ¶ 35, theJones court observed that "[a]fter the shooting took place, appellant did not stop the SUV and exit it, nor did appellant drive the SUV to a police station. Appellant drove the SUV and parked it in an alley behind an apartment building. Accordingly, we hold that the jury did not lose its way and create such a manifest miscarriage of justice that the conviction must be reversed." Id.
 {¶ 95} Likewise, in this case, defendant did not keep the gun and wait for law enforcement authorities to arrive, lay down the gun for law enforcement authorities to find, or deliver the gun to law enforcement authorities.
 {¶ 96} Therefore, construing Copley and Jones, defendant's assertions that his conviction for tampering with evidence is against the manifest weight of the evidence and is not supported by legally sufficient evidence are not persuasive. Therefore, we overrule defendant's fourth assignment of error.
 {¶ 97} Accordingly, having overruled all four of defendant's assignments of error, we therefore affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Bryant and McGrath, JJ., concur.
[1] (2004) Am.Sub.H.B. No. 12 amended R.C. 2923.12, effective April 8, 2004.